Ovrasr McGrmtn, J.
The plaintiff, the Liza Company, is a limited partnership engaged in the production of the play ‘ ‘ My Fair Lady”. Its sole general partner is one Herman Levin, an experienced and a successful Broadway producer.
The defendant, the Mark Hellinger Theatre, Inc., is a corporation which owns and operates a theatre of that name. Its principal officers and stockholders are Stanley Stahl, a defendant herein, and his father, Max Stahl, neither of whom had any experience in the theatre business prior to March 15, 1957, when they acquired the Hellinger Theatre from one Anthony Brady Farrell, approximately a year after ‘1 My Fair Lady ’ ’ had opened at that theatre. The agreement which governs the run of the play, and which is the subject of this litigation was entered into on September 9, 1955, and was signed on behalf of the theatre by Farrell and on behalf of the Liza Company by Levin. Farrell’s obligations under the theatre contract were assumed by the Hellinger Theatre and guaranteed by Stanley Stahl.
The agreement contained the following significant provisions which have become the bases of the instant litigation: (a) that the play might run at the theatre so long as its gross weekly box-office receipts did not fall below the sum of $35,000 per week for two successive weeks, (b) that the producer might advertise only in such media as were approved by the theatre, (c) that the sale of all tickets was to be under the jurisdiction of the theatre, and, lastly, that prices were to be subject to mutual understanding.
The play flourished and prospered and relations between the parties were harmonious until November, 1960, when Levin instructed his general manager, one Philip Adler, to ascertain from the Stahls if the “ stop clause ” of $35,000 per week might not be increased to $42,000 per week. At this time the play had already run four and a half years, the receipts were off, and Levin, not unnaturally, was concerned. The Stahls refused. In January, 1961, Levin instructed Adler to discuss the subject of ‘ ‘ twofers ’ ’ with the Stahls. This term describes theatre tickets which, when presented at a box office, entitles the holder *725 to buy two tickets at reduced rates. The Stahls agreed, although, according to Stanley Stahl, they agreed only that “ twofers ” were to be used temporarily and until after the New York City Summer Festival of 1961. In July, 1961, and at a time when Levin was in Europe, the Stahls again met with Adler, and this time it was suggested that the “ stop clause ” be raised to $42,000 per week, in anticipation of the show’s death at the end of the year. Adler indicated that he thought Levin would approve I,he suggestion upon his return from Europe. Upon his return, however, Levin did not approve any change in the “ stop clause ” provision.
But, at the July meeting, Adler significantly gave his permission to Stanley Stahl to call one, Morris Jacobs, general manager for the organization of Richard Rodgers, another well-known Broadway impresario who was preparing to bring in a new show “No Strings ”, thus indicating he too envisaged a demise of “My Fair Lady”. Indeed, the Stahls did call up Jacobs and in August, 1961, contracted to lease the Hellinger Theatre to Rodgers, commencing February 22, 1962.
On September 27,1961, the attorneys for the theatre formally demanded a cessation of the further use of “ twofers ”. On October 2, 1961, the plaintiff instituted legal action, and on October 10, 1961, the attorneys for both parties entered into a stipulation relative to pleadings and agreeing to preserve the status quo pending the outcome of this trial.
This court reaches the conclusion that the agreement between Adler, on behalf of Levin, and the Stahls regarding “ twofers ” was temporary in nature and not intended by either party to be for an indefinite period. The plaintiff would bind the Stahls to an unending arrangement because of an alleged custom in the theatre to the effect that a “ twofer ” agreement is irrevocable except by mutual abrogation. However, in the Stahls we have parties who are admittedly tyros in the theatre, engaged in their first theatre venture, and Stanley Stahl disavowed knowledge of any such custom. It cannot be presumed that as novices they contracted with reference to a custom, and the court adopts the version of Stanley Stahl that the “ twofer ” arrangement was limited, or as he called it, a “stopgap” (see Richardson, Evidence [8th ed.], § 602).
The plaintiff would portray Adler as a mere ‘1 deckhand ’ ’ for Levin, but the three crucial conversations between the parties herein were all with Adler, and he emerges more of a plenipotentiary than Levin would have him appear for the purposes of this lawsuit. At least, insofar as the “ twofer ” arrangement was concerned, he had sufficient apparent authority to bind Levin *726 (see Wen Kroy Realty Co. v. Public Nat. Bank & Trust Co., 260 N. Y. 84).
The timely decision and notice of the theatre to terminate “ twofers ”, plus its change of position following Adler’s permission to use his name with the Rodgers organization, acts in equity to estop the plaintiff from remaining in the Hellinger Theatre (Lynn v. Lynn, 302 N. Y. 193, cert, denied 342 U. S. 849 [1951]; Rifkin v. Stuyvesant Ins. Co. of N. Y., 240 App. Div. 540 [1st Dept., 1934]; Trimble v. New York Life Ins. Co., 234 App. Div. 427 [1st Dept., 1932]).
Further, the court finds that even after the theatre’s protest of September 27, 1961, the producer continued to advertise without the consent of the theatre, and specifically employed “ spot ” advertisements on TV channels without the knowledge or consent of the theatre, resulting in the theatre’s letter of January 15, 1962, wherein it declared its intention to terminate the agreement, effective January 17, 1962. The plaintiff argues that silence in the past constituted a waiver and that the provision Avas but a “ sham ” unrecognized in the theatre world. And Levin on the stand cavalierly stated it Avould have been “ stupid ” to have asked consent for the TV advertising.
As for the alleged custom in the theatre with relation to advertising, such evidence is not helpful unless it is demonstrated that there exists an ambiguity in the contract which the custom and usage will resolve (Pink v. American Sur. Co. of N. Y., 283 N. Y. 290 [1940]; B. M. Heede, Inc., v. Roberts, 303 N. Y. 385; Green v. Wachs, 254 N. Y. 437 [1931]).
The terms of this contract, however, relating to Avhat type of advertising the theatre’s consent must be obtained for and hoAv that consent must be obtained are quite clear and unambiguous, to wit: “no billing, distributing or advertising of any kind Avhatsoever in the newspapers or in any other shape or manner shall be done by the party of the second part Avithout the written consent of the party of the first part ”.
And again it is to be noted that the contract declared this provision to be “ the essence ” of the contract and that “ a violation of this clause shall be considered a violation of the whole contract ”.
Even if the theatre did in fact by its silence or lack of timely protest waive past breaches of this clause, which defendants in any event deny, such conduct did not operate as a waiver of the condition itself (Gardner v. Clark, 21 N. Y. 399 [1860]; Gail v. Gail, 127 App. Div. 892 [1908]; Werking v. Amity Estates, 2 N Y 2d 43 [1956], appeal dismissed 353 U. S. 933 [1956]; New York Rubber Co. v. Rothery, 107 N. Y. 310, 316; Cahen v. Platt, *727 69 N. Y. 348 [1877]; Jackson ex dem. Blanchard v. Allen, 3 Cow. 220 [1824]; Conger v. Duryee, 90 N. Y. 594 [1882]; 3 Williston, Contracts [Rev. ed., 1936], § 741).
And so this court is constrained to find that the advertising after dispute arose and after the plaintiff had been expressly informed by the theatre’s letter of September 27, 1961 that its consent was required before any advertising could be placed constituted a breach of a clause the parties made an essential condition of the contract; and the plaintiff cannot now be heard to invoke the aid of equity in order to elude the consequences of its breach. To hold otherwise would empower the plaintiff to continue to stimulate sales by unauthorized advertising, over the defendant’s valid protestation and thus keep “ Fair Lady ” alive indefinitely, although after six years, without such advertising, “ Fair Lady ” would indubitably run its course and cease to be, along with “ Abie’s Irish Bose ” and “ Life with Father ”.
Accordingly, this court finds that the plaintiff is not entitled to the declaratory relief which it seeks, inter alia, that the defendants be enjoined from taking action to terminate the run of “ My Fair Lady ”, and that the defendants were entitled to terminate the lease of the parties. The complaint is dismissed and the plaintiff is directed to vacate the premises involved herein on or before February 22, 1962.
The foregoing constitutes the decision of the court in accordance with the provisions of section 440 of the Civil Practice Act.